**DELTA STEAMSHIP LINES, INC. and Waterman Steamship Corporation**

v.

**The UNITED STATES.**

No. 653–81C.

United States Claims Court.

Sept. 26, 1983.

John P. Meade, Washington, D.C., for plaintiffs. J. Michael Cavanaugh and Graham & James, Washington, D.C., of counsel.

Frances L. Nunn, with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant. Glenn E. Harris, New York City, of counsel.

ON CROSS–MOTIONS FOR
SUMMARY JUDGMENT

OPINION

SPECTOR, Senior Judge.

This is an unusual public contract case in the sense that it does not involve conventional contracts for the direct procurement by the Government of property, services or

construction.[1] Rather these contracts grow out of the Merchant Marine Act of 1936, as amended,[2] which states it to be "necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States * * * and (e) supplemented by efficient facilities for shipbuilding * *."[3]

In furtherance of those public policy objectives, Subchapter V of the Act[4] authorizes the Maritime Subsidy Board in the Department of Commerce[5] to enter into construction-differential subsidy (CDS) contracts with United States ship purchasers or shipyards providing for payment by the Government of a percentage of the ship construction costs incurred by United States carriers in United States shipyards. The ship purchasers further agree to maintain the vessels under United States registry for 25 years and to have them built "suitable for use by the United States for national defense or military purposes in time of war or national emergency * * *."

These contract disputes arose when members of the staff of the Maritime Subsidy Board responsible for processing subsidy payments to plaintiffs on behalf of the Board concluded (some three years after subsidy payments had been made) that the payments should be recouped. They were thereupon offset against later subsidy payments as to which there is no dispute. When plaintiffs protested this action, the matter was referred to the Office of Administrative Law Judges for a hearing and recommended decision. A recommended decision in favor of plaintiffs was issued by Administrative Law Judge Frank W. Vanderheyden. However, the Board declined to adopt the Administrative Law Judge's decision, preferring instead to adhere to the position advocated by its own staff. For readier reference that decision of the Board is annexed hereto as Appendix A.

Article XIV of these subsidy contracts is a non-standard "Disputes" clause which provides that:

(a) Any dispute between the parties concerning any question of fact under this Contract which is not disposed of by agreement shall be subject to the provisions of this Article. The Purchaser may initiate a dispute by transmitting a letter to the Chief, Office of Ship Construction setting forth in detail the matters in dispute. The Chief, Office of Ship Construction or his duly authorized representative shall review the Purchaser's transmittal and shall make every reasonable effort to reach agreement with the Purchaser resolving the matters in dispute. If, after 90 days from the date the Chief, Office of Ship Construction receives Purchaser's letter initiating the

---

1. See and cf. the Contract Disputes Act of 1978, Pub. Law No. 95–563, 92 Stat. 2383 (Nov. 1, 1978), 41 U.S.C. § 601 et seq. (Supp.1978).

2. 46 U.S.C. § 1101 et seq. (1976).

3. 46 U.S.C. § 1101 (1976). In this connection, see also, 116 Cong.Rec. 16591 (1970), discussing an amendment to the Merchant Marine Act of 1936 (H.R. 15424), which revised the construction-differential subsidy system to provide that the shipyard (rather than the purchaser) be the direct applicant for subsidy of ship construction costs. The sponsor of the amendment noted that:

Construction-differential subsidy is intended to enable an American-flag operator to purchase a ship from an American shipyard at a price approximately equal to that which the operator would pay to have the same vessel constructed in a representative foreign shipyard. * * *

4. Construction-Differential Subsidy, 46 U.S.C. § 1151 et seq. (1976).

5. The Maritime Act of 1981, Pub. Law No. 97–31, 95 Stat. 151 (August 6, 1981), transferred this function to the Department of Transportation.

dispute, any matters raised by Purchaser's letter remain in dispute, the Chief, Office of Ship Construction shall forthwith notify the Board that a dispute is pending and shall forthwith transmit to the Board a written statement of the matters remaining in dispute. Upon receipt of such written statement, the Board or its duly authorized representative shall request from the Purchaser and the Chief, Office of Ship Construction written statements of position on each matter in dispute, and any other information which the Board or its duly authorized representative deems necessary. Upon submission of the statements of position or any time thereafter, the Purchaser or the Chief, Office of Ship Construction may request a hearing or the Board may, on its own motion, designate the matter or matters for hearing. In the event of such request or designation, both parties shall be afforded the opportunity to be heard and to present evidence before the Board or its duly authorized representative. The determination of the Board on each matter in dispute shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, capricious, arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence; provided that, if the Secretary of Commerce undertakes to review the Board's determination, the Secretary's review decision shall have the finality prescribed above for the Board's determination.

(b) This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above; Provided, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or Board or Secretary of Commerce on a question of law.

Plaintiffs' claims are asserted as breaches of express provisions of the relevant CDS contracts. This action is therefore brought under 28 U.S.C. § 1491 (Supp.1980), which vests jurisdiction in this court to render judgment "upon any claim against the United States founded * * * upon any express or implied contract with the United States, * * *." Contract claims brought under 28 U.S.C. § 1491 (Supp.1980), which have previously been the subject of an administrative decision under a contract provision which relates to the finality or conclusiveness of that decision, are judicially reviewed against the standards set forth in the so-called Wunderlich Act.[6]

It is academic in this case whether or not those judicial review standards are applicable herein. The essential facts are not in dispute. Any secondary factual issues are subsumed in a primary question of law, namely, whether the contracts, fairly interpreted, warrant the action taken by the Subsidy Board in recouping subsidy payments previously made. That legal issue has been framed by cross-motions for summary judgment.

*Statement of Facts*

Prior to awarding a construction-differential subsidy (CDS) contract for a ship to be constructed at a negotiated price, the Secretary of Commerce determines that the

---

**6.** 68 Stat. 81, 41 U.S.C. § 321–2 (1964 ed.).

"§ 321. Limitation on pleading contract provisions relating to finality; standards of review

"No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. [Emphasis in original.]

"§ 322. Contract provisions making decisions final on questions of law

"No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

negotiated price is "fair and reasonable".[7] Under the Delta CDS contract dated May 19, 1971, the Board agreed to pay plaintiff Delta a subsidy for three LASH (lighter-aboard ship) container cargo vessels to be constructed for Delta by Avondale Shipyards, Inc. The contract at issue deals solely with Delta's costs in designing the ships and not with the actual construction costs to be incurred by Avondale. Article I(d) of the Delta CDS contract covering design services provides in pertinent part as follows:

> The Board *shall pay* to the Purchaser [Delta] as construction-differential subsidy *44.2 percent of the Purchaser's cost,* not exceeding for subsidy purposes the total sum of $1,411,145, *for design work,* plan approval and inspections (including architectural and engineering services, and interior decorating services, together with related travel, reproduction and communication expenses) *required for the construction of the Vessels and furnished by the Purchaser;* provided that such costs shall be subject to audit by the Board, and provided further that the cost of Purchaser's design work, plan approval and inspections eligible for subsidy shall *not include salaries* or expenses *of officers or employees of the Purchaser [Delta] which would be paid out of the Purchaser's administrative overhead independently* of the construction work and shall not include costs incurred by assignment of ship's officers and crew as inspectors of construction unless approved by the Board. [Emphasis supplied.]

The Board's staff included $450,145 for design services costs in the above-cited ceiling of $1,411,145. Prior to entering into this CDS contract, Delta had entered into an arm's-length, negotiated fixed-price contract with the naval architect firm of Friede & Goldman (F & G) for exclusive design, plans and specifications for a C–2 containership. The fixed price was $422,000, plus model testing. When Delta later decided to abandon the C–2 containership project, the F & G contract was amended to provide for

design, plans and specifications for a C–8 LASH/containership better suited for Delta's operations.

The initial C–8 LASH design was discarded as too expensive, and F & G was then asked to design a longer C–9 LASH/containership unlike any previously built. To do so F & G was obliged to modify the C–8 LASH design for some vessels which Avondale had previously built for other ship operators. The modification work was substantial and included lengthening the hull by 73 feet, preparation of completely new scantling drawings and inboard and outboard profiles, addition of a dehumidification system, complete redesign of living quarters, relocation of fuel and ballast tanks, plus a large number of other design changes. Moreover, the design furnished for the Delta LASH/container vessels differed substantially from that being contemporaneously provided for the plaintiff Waterman herein, and for Central Gulf Lines, a third ship operator not involved in this litigation.

The design services furnished to Delta under its contract with F & G were entirely satisfactory and were used. There is nothing in the record to indicate otherwise. Pursuant to its CDS contract with the Board, payments to F & G were therefore "required" costs to Delta and Delta paid F & G $422,000 plus $28,145 for model testing. The total payment of $450,145 corresponded to the amount which had been included for design services in the above-cited ceiling of $1,411,145 set forth in the CDS contract which Delta had negotiated with the Board.

That figure of $450,145 included $239,145 for design costs expended on the C–2 containership project earlier described, which had been amended to provide for a C–8, and finally for a C–9 LASH/containership.

At the time the CDS contract was signed, some question was raised by the Board as to whether it was fair and reasonable to include costs of $239,145 attributable to the original C–2 design. But the Board raised no issue whatever with respect to the fair-

---

**7.** 46 U.S.C. § 1152(a) (1976).

ness and reasonableness of the remaining $211,000 attributable exclusively to the later C–8 and C–9 LASH/containership design.

In a letter dated February 20, 1973, the Board disallowed payment of subsidy for that $239,145 attributable to the earlier C–2 containership design, on the grounds that it was not a "required" cost within the meaning of the above-quoted Article I(d) of the CDS contract for the LASH/containership project.[8] However, it is important to note that in the same letter the Board stated that it had "no question that CDS payments for $211,000 for [modifying] a prior LASH C8–S–81b design can be approved."

Delta thereafter submitted and was paid 44.2 percent of the remaining $211,000, in accordance with its CDS contract.

Prior to payment, the staff of the Maritime Administration's Central Region had audited Delta's fixed-price contract with F & G and had also concluded that F & G's costs would support payment by Delta to F & G of $211,000. No explanation is offered as to why F & G's costs were in fact audited, nor the authority for auditing this fixed-price subcontract. Delta had a firm fixed-price contract with F & G in the amount of $450,145, an amount which had been included for design services within the ceiling of $1,411,145 set forth in Delta's negotiated CDS contract with the Board. That amount to be paid under subcontract with F & G represented a "required" cost to Delta, and Delta had in fact paid the subcontract price of $450,145 to F & G upon satisfactory completion of the subcontract.

In the Fall of 1973, and without Delta's knowledge, F & G's books were again reviewed. This time the Board concluded that the time of Mr. Goldman, president of F & G, should have been shown as overhead, rather than as a direct cost. Mr. Goldman had contributed a large quantity of time and effort to performance of this design contract for Delta. Nothing in Delta's CDS contract with the Board mandates how a subcontractor's costs are to be allocated within its fixed-price subcontract. It is possible that the Board or its staff was confused by the above-quoted provision in Article I(d) of the Delta CDS contract excluding the salaries of *Delta* officers from subsidy. That provision in the CDS contract insures that only the direct costs to Delta of vessels it was purchasing would be subsidized, and not Delta overhead expense which would have been incurred in any event and whether or not vessels were being purchased by Delta under the subsidy program. In contrast, the entire contract price in Delta's subcontract with F & G constituted a direct and "required" cost to Delta which it had to pay and did pay.

In any event, on June 1, 1976, the Board's staff, some three years after it had been paid to Delta, deducted an additional $139,-107 from the F & G design contract as not eligible for subsidy, and backcharged Delta for 44.2 percent of that amount, or $61,-485.29.[9] Delta was not aware of any alleged impropriety by F & G warranting a reduction in the contract price which it agreed to pay, and which it had in fact paid to F & G. The price agreed upon was deemed fair and reasonable at the time the contract was entered into with F & G and had been incorporated into the overall ceiling negotiated with the Board in the CDS contract. Mr. Goldman had invented and developed the LASH design, and F & G was a well-known naval architectural firm. Moreover, 55.8 percent of the F & G contract price was being paid by Delta from its own funds and had to be justified by Delta management.[10]

Under Article I(d) of the CDS contract, it was the Purchaser's (Delta's) costs which were subject to audit, and such an audit

---

8. Delta had previously appealed from a disallowance by the Board's staff of this $239,145, and the Board had denied its appeal. Delta does not question that disallowance of $239,145 in this litigation.

9. This was in addition to the $239,145 previously deducted for subsidy purposes, as described in note 8, *supra*.

10. It will be recalled that only the remaining 44.2 percent of its expended costs were subsidized.

would clearly show that the F & G contract price was a cost incurred by Delta, was a cost paid by Delta, was a cost allocable to this project, was a cost within the cost ceiling set forth in Delta's CDS contract with the Board, and was a "required" cost within the meaning of Article I(d). Delta did not inquire into F & G's actual costs after it had negotiated the best possible market price for F & G's services. If F & G's actual costs had exceeded its contract price, any resultant losses would have had to have been absorbed by F & G, and would not have been paid by Delta. The amounts estimated and allocated by F & G for direct costs, overhead costs and profit were irrelevant to Delta once it had negotiated a fair and reasonable and the best possible overall price for the services to be provided by F & G.

The Board had in fact concurred in the reasonableness of the F & G contract price in its negotiation of a ceiling in its CDS contract with Delta, and also in the above-quoted letter of February 20, 1973, as well as in its opinion disallowing the $239,145 attributable to the C–2 containership design. In the latter opinion the Board stated that "previous experience of this agency indicates that the design cost for other repeat orders for construction of vessels of this magnitude should be in the range of $200,000 to $220,000 * * *." [11]

Nevertheless, in a letter of July 13, 1976, from the Board, its staff advised Delta that:

> * * * upon further review of the records in [this] matter * * * the total design work required for [the] Delta, Waterman and Central Gulf LASH vessels was performed by Friede & Goldman at a cost which will not justify subsidy participation on any amount that exceeds $215,680. This office has concluded that this amount should be equally divided

between the three owners, that is $71,893 to each for purposes of making subsidy payments.

Thus, by successive disallowances of $239,145 and $139,107, Delta's "costs" under its contract with F & G were reduced to $71,893 ($23,964 per vessel) as "allowed" design fees and model testing costs deemed to be eligible for subsidy at the rate of 44.2 percent.

The Board describes the circumstances leading to the second review of F & G's costs as follows:

> [T]he former office manager * * * reported to the FBI that F & G's books had allegedly been altered for purposes of the MarAd audit. An FBI review of the original cost records indicated to the MarAd staff that overpayments of subsidy had been induced by the information presented to the MarAd auditors by F & G. Whereas the original records treated Mr. Jerome L. Goldman's * * * time as overhead, the records shown to MarAd had been allegedly altered to show Mr. Goldman's time as direct costs. * * * [12]

On June 5, 1978, defendant acting through the Justice Department entered into a "Covenant Not to Sue" with F & G and Mr. Goldman. In consideration of the payment by the latter of $40,000 as "reimbursement of excess subsidy payments", [13] defendant agreed not to sue F & G or Goldman under common law, the False Claims Act, or any other statute for "damages or costs caused by or arising from the conduct, performance, and receipt by Jerome L. Goldman and Friede & Goldman, Inc. * * * of payments or overpayments of U.S. Maritime Administration Construction Differential Subsidy funds * * *."

The "Covenant Not to Sue" also contained this provision:

> Further, it is understood that the aforesaid payment shall not constitute an

---

**11.** It will be recalled that the Board's letter of February 20, 1973 stated it had "no question that CDS payments for $211,000 for a prior LASH C8–S–81b design can be approved."

**12.** *See* attached opinion of the Board, at page 573.

**13.** Note that no "subsidy" payments had previously been made to F & G. The latter had been paid $450,145 by Delta under its contract with Delta, and 44.2 percent of Delta's costs were subsidized under Delta's CDS contract with the Board.

admission on the part of Jerome L. Goldman and/or Friede & Goldman, Inc. of any violation of the False Claims Act or the applicable statute or law, and is occasioned by the parties' mutual desire to avoid the costs and uncertainties of litigation.

In other words, there is nothing in this settlement agreement admitting of wrongdoing on the part of F & G.

Facts relating to the claim of the plaintiff Waterman are essentially the same. Article I(d) of its CDS contract provided as follows:

> The Board *shall pay* to the Purchaser [Waterman] as construction-differential subsidy *44.2 percent of the Purchaser's cost,* not exceeding for subsidy purposes the total sum of $910,000, *for design work,* plan approval and inspections (including architectural and engineering services, together with related travel, reproduction and communication expenses, but excluding costs for design work other than that directly allocable to the Vessels and for which construction-differential subsidy has not heretofore been paid, and also excluding duplicative plan approval and inspection expenses incurred for other LASH construction projects) *required for the construction of the Vessels and furnished by the Purchaser;* provided that such costs shall be subject to audit by the Board, and provided further that the cost of the Purchaser's design work, plan approval and inspections eligible for subsidy shall *not include salaries* or expenses *of officers or employees of the Purchaser [Waterman] which would be paid out of the Purchaser's administrative overhead independently* of the construction work and shall not include costs incurred by assignment of ship's officers and crew as inspectors of construction unless approved by the Board. [Emphasis supplied.]

14. It will be noted that this $210,000 ($70,000 per vessel) closely approximated the $211,000 in Delta's contract, after the disallowance of $239,145 which had been allocated to Delta's earlier C–2 containership design.

Of the $910,000 ceiling established above, $210,000 was included by the staff for design services.[14] Waterman agreed to pay that sum to F & G in an arm's-length contract [15] which it had concluded in its own best business judgment was competitive, fair, and reasonable. Waterman's new LASH vessels were also quite different from the earlier C–8 vessels built for other operators in 1968–69. They were 73 feet longer and designed to carry six additional LASH barges. The barge cranes were redesigned and improved. The steam turbine generators were of a different size and produced by a different manufacturer. Cargo oil tanks and associated pumping and piping systems were eliminated, and the boilers were changed. The vessels also differed materially from those being constructed for Delta and Central Gulf Lines in many details not recited here.

As in the case of Delta, the record shows that F & G provided the design services under its contract completely and satisfactorily, and that it was paid $210,000 by Waterman. When this amount was submitted to the Board for subsidy payment of 44.2 percent, it was paid. Three years later and following the two audits of F & G earlier described, Waterman was also advised that $138,107 of the $210,000 paid by it to F & G was disallowed for subsidy purposes and $61,043.49 (44.2 percent of $138,107) was recouped on subsequent vouchers submitted under Waterman's CDS contract with the Board.

### Discussion

█ It is unique to this case that the administrative decision under review was issued by the same Board which negotiated and administered the contracts interpreted in its decision. That interpretation virtually ignores the clear contractual obligation in Article I(d) that the "Board shall pay to the purchaser * * * 44.2 percent of the Purchaser's cost * * * required for the con-

15. Not reduced to writing because of Waterman's long-standing business relationship with F & G.

struction of the Vessels * * *." A subsequent provision for audit of the Purchaser's costs does not repeal that contractual commitment. The purpose of an audit of the Purchaser was to insure that the *Purchaser's* invoiced costs were in fact incurred by the Purchaser, and were allocable to this project. The reasonableness of the costs to be incurred by the Purchaser under its firm fixed-price subcontracts with F & G, had been determined when the CDS agreements were negotiated with the Purchasers. The reasonableness of the subcontract price was in fact thereafter reconfirmed on at least two occasions in letters and in the Board's decision relating to the C–2 containership design, all as above detailed.

The Board now appears to read the CDS contracts (and the fixed-price subcontracts with F & G) as if they contained renegotiation or redetermination provisions permitting a subsequent unilateral revision of those firm fixed-price agreements in the Board's discretion. But the CDS agreements are not so constituted. They are mutually binding contracts amply supported by consideration. In exchange for the promise of a subsidy, plaintiffs refrain from constructing their ships in less expensive foreign yards, the Government achieves the national policy objectives set forth in the above-quoted Merchant Marine Act, and the Purchasers are reimbursed part of their costs as construction-differential subsidy. The amounts which they paid to F & G were clearly costs which plaintiffs were obligated to pay to F & G and those amounts did not depend on or vary with a hindsight review of F & G's profit or loss on its subcontracts. Had plaintiffs known that the Board would subsequently backcharge them based on an audit and a unilateral redistribution of their subcontractor's costs, plaintiffs would have been obligated to contract with F & G on a cost-plus-fixed-fee basis, after first securing approval from the Board for the use of that inefficient type of subcontract.

But even assuming, *arguendo,* that the F & G subcontracts had been of the cost-reimbursable type, there would still have been no basis for disallowing Mr. Goldman's con-

tributions to performance by treating his time as "overhead" rather than as "direct" costs. There was an understandable prohibition in Article I(d) against treating the salaries of Delta's and Waterman's officers as eligible for subsidy. But this certainly did not extend to contract payments required to be made to an independent subcontractor for design services. If that were a proper interpretation of Article I(d), then plaintiffs' travel expenses, for example, would also be subject to disallowance if it were later determined on audit that the salaries of officers of the carrier were included in the ticket price.

It is noteworthy that the Administrative Law Judge to whom the dispute was referred for a hearing recommended on these facts, and in a well-reasoned opinion, "that the Board order a reinstatement of the disallowed design fees in the amount of $61,-485 to Delta, and $61,043 to Waterman, plus interest from the date such monies became due and owing."

That opinion is worth setting forth in some detail. It reads in pertinent part as follows:

> The Purchaser should prevail in this dispute both on legal and equitable grounds. * * *
>
> Stripped of surplusage, the facts as viewed by the undersigned, show that the Staff upon discovery of alleged wrongdoing by F & G, seeks to change the rules of the game, and be recompensed from Purchasers who were innocent of any wrong. * * *
>
> When language is clear, and devoid of inconsistencies, and free of ambiguity, the intent of the parties should be determined from the plain language of the agreement * * *. Nor, under the guise of interpretation should terms be added which the parties did not see fit to include. * * * The word "required" should be given its natural and ordinary meaning, namely, those costs that are necessary and related to the construction of the vessels. * *.*

Looking at the black and white of the Article a post-contracting reexamination of F & G's costs is not contemplated.[6] Its language is limited to an audit of only the "Purchaser", and not subcontractors, such as F & G, and provides yet another reason why the Purchasers were justified in believing at the time of the execution of the CDSA that any review would be confined to Delta or Waterman and not F & G. Even if it were determined that an audit of F & G is contemplated by the Article, the Staff, and not the Purchasers have the burden of showing the costs of the subcontractor were not fair and reasonable. The Staff has not carried this burden.

* * * The price arrived at between the Purchasers and F & G for the design services was based upon the formers' best business judgment and arrived at in arms' length transactions, fully paid for, and free of any wrongdoing on the Purchasers' part. The Staff has not come forward with convincing evidence that the price paid by the Purchasers, relying upon their seasoned business judgment, was other than fair and reasonable. It is noteworthy that the Staff did not proffer evidence which would show that in the real business world at that time the design costs by other naval architects would have been less than that charged by F & G. Additionally, Marad in its communication of February 20, 1973, spoke of Delta's design fees of $211,000 being within an acceptable range.

*     *     *     *     *     *

One of the basic arguments of the Staff with F & G's costs is that Goldman's direct labor charge was a singular event, and the assumption that his time should be charged to overhead as done on other F & G projects. Goldman, how-ever, had a great deal of personal involvement with the LASH project, and there were many working level discussions. Notwithstanding any claimed wrongdoing on the part of F & G, it would appear incumbent on the staff in any audit, to determine with some exactitude to what extent Goldman's activity came within that which could be classified as either overhead expenses or direct labor.

The equitable considerations in this matter greatly favor the Purchasers. They acted in good faith, in their best business judgment, and were obligated themselves to pay 55.8 percent of the design costs, facts that would hardly encourage Purchasers to act as wastrels.

* * * Staff in the Covenant settled "in reimbursement of excess subsidy payments" for $40,000. At one and the same time, involving the same monies, the Staff has withheld payments from the Purchaser, and retrieved $40,000 from F & G * * *. One cannot help but recoil from the inequity of such a result. * * * [16]

---

[6] It is doubtful that the Staff has legal authority to audit the costs of the design subcontractor F & G by virtue of the Article. There is not only a lack of privity between the subcontractor F & G, and the Board, but the entire language of the Article is directed to the Purchaser, with any audit limited thereto. * * *

In contrast to the above opinion by the Administrative Law Judge, the Board's opinion appended hereto is supported by neither logic nor the contract provisions. It strains to reject the findings of the Administrative Law Judge in favor of the position taken and advocated by its staff, which argued that the "fair and reasonable" language in the underlying general statute nullifies the word "required" in the actual contract which the Board drafted in imple-

---

**16.** This case was originally assigned to Chief Administrative Law Judge William G. Spruill, who ruled at a Prehearing Conference as follows:

To digress just a moment, this gets us to another subject as to the burden of proof, which you raised. And there is no question in this matter that the burden of proof—the ultimate burden is going to be on the govern-ment's side. The government has taken action in disallowing certain subsidy fees under the contract and it would be up to the government to justify their disallowance. * *

When the case was reassigned to Administrative Law Judge Vanderheyden, he adopted "all previous Rulings made by Judge Spruill."

mentation of that underlying statute. It further ignores the importance of the Board's own approval on several occasions of the "fairness and reasonableness" of the F & G contracts which the plaintiffs had entered into, on a firm fixed-price basis, in reliance on that approval.

In short, there is no statutory nor contractual authority for withholding these subsidy payments. The Board is not privileged to rewrite its contract. Its conclusion on the legal question relating to a proper interpretation of the CDS contracts, is in error. The factual premises on which it approaches that legal question, namely, whether or not the services of a subcontractor's officer were properly charged as direct costs, and whether or not the subcontract firm fixed-price was fair and reasonable, are irrelevant to that basic legal issue relating to interpretation of the CDS contracts. Those factual premises are, moreover, not supported by substantial evidence nor by any evidence of record, even if they are assumed for the sake of argument to be relevant.[17]

A more troublesome question is presented by plaintiffs' claim for interest on the subsidy payments which have been withheld. Recovery of interest was recommended in the Administrative Law Judge's opinion above quoted. Acknowledging that the general rule prohibits recovery of interest,[18] plaintiffs present several arguments to illustrate that this case is different. Firstly, they urge that they are seeking, not interest *on a claim*, but interest as *part of* a claim. This is a case of "wrongful withholding of CDS payments" and not "mere delay in payment", causing an increase in the cost of construction which is to be subsidized under the Merchant Marine Act. If not reimbursed, the argument goes, the Act will not achieve its purpose of eliminating the disadvantage of building vessels in United States shipyards. But this argu-

ment could be made with respect to any claim against the United States, where the statutory prohibition against payment of interest serves to frustrate a claimant's desire to be made whole by the judgment.

As a second argument, plaintiffs point out that the delays in payment of subsidy are in breach of Article XIV of the CDS agreements, quoted earlier in this opinion. That "Disputes" article, it is urged, sets out a timetable for the handling of disputes. If after 90 days in the hands of the Chief, Office of Ship Construction, a matter is still in dispute, it is to be referred to the Board. On receipt, the Board requests from the Purchaser and the Chief, Office of Ship Construction, written statements of position. Counsel argues that the "contracts thus provide for the prompt resolution of disputes, significantly mitigating any damage caused by loss of interest on the withheld payments."

In this case, the subsidy payments were disallowed on June 1, 1976, informally protested in October 1976, and formally protested under the "Disputes" provision on March 9, 1977. Despite the 90-day requirement, the matter was not referred to the Board until April 5, 1978. It was assigned to the Chief Administrative Law Judge for hearing on June 27, 1978, and the Administrative Law Judge's decision was rendered November 2, 1979. The Board rendered its decision on April 20, 1981. Plaintiffs point out that "(t)he entire process took almost five years. * * * In such circumstances, interest should be awarded as damages for breach of the disputes clause to compensate plaintiffs for this unwarranted delay in the adjudication of their claims."

This same argument could be made with respect to the procedures which have been developed under the standard "Disputes" provision generally found in Government contracts. Those procedures also contem-

---

**17.** It is unnecessary to decide whether defendant is also seeking a double recovery here because of its prior direct settlement with and recoupment from F & G.

**18.** 28 U.S.C. § 2516 (Supp.1982). "(a) Interest on a claim against the United States shall be allowed in a judgment of the United States Claims Court only under a contract or Act of Congress expressly providing for payment thereof."

plate a time schedule which is, unfortunately, often "honored in the breach". Delays in processing a dispute have not heretofore been regarded as a basis for departing from the statutory prohibition against payment of interest on a claim against the United States.

Plaintiffs' last argument is troublesome. The statutory prohibition against payment of interest does not apply in the case of an "Act of Congress expressly providing for payment thereof".[19] The Contract Disputes Act of 1978[20] authorizes payment of interest on claims coming under that Act measured from the date the claim is received by the contracting officer. The question here is, therefore, whether or not these CDS contracts are covered by the Contract Disputes Act which "applies to any express or implied contract * * * entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction * *; or,

(4) the disposal of personal property."[21]

Plaintiffs' argument is that "(e)ven though title to a vessel constructed with CDS aid passes to the private purchaser, CDS contracts are in a very real sense contracts for the procurement of property for government service. Because a goal of the CDS program is to maintain an efficient and adequate operational merchant marine for use in times of military emergency, each ship constructed with CDS is not only re-quired to be registered under the U.S. flag, and remain available for government use in an emergency, but also to have various 'National Defense Features' that are subsidized at a 100 percent rate. *See* 46 U.S.C. §§ 1151(b), 1152(b), 1153, and 1242."

Plaintiffs also point out that because the Board's decision was not issued until April 20, 1981, "the matter was pending before the Board—the only equivalent of a 'contracting officer' under the CDS contracts—on March 1, 1979." The latter date is the effective date of the Contract Disputes Act. Under its terms, a claim must be "pending then before the contracting officer or initiated thereafter" to be covered by the Act.

Although this argument presents a closer issue, it is concluded from a reading of the Contract Disputes Act and its legislative history that it was not intended to reach this type of contract covering the payment of subsidy for construction of a vessel purchased by a private party for its own use. It is rather the conventional contract for the direct procurement of property, services and construction, to be used directly by the Government, which is the type of Government contract covered by the Act.

*Conclusion*

Plaintiffs are entitled to recover the subsidy payments which have been withheld. Judgment shall be entered in favor of plaintiff Delta in the amount of $55,641.17, and in favor of plaintiff Waterman in the amount of $55,198.88.[22]

19. Note 18, *supra.*

20. Note 1, *supra.*

21. Section 3(a) of the Contract Disputes Act of 1978, note 1, *supra.*

22. As can be seen from a comparison of the Board's decision, Appendix A, and the Admin- istrative Law Judge's opinion above quoted, the Board partially recognized the validity of plaintiffs' claims in the amount of $5,844.12 each. The judgment to be entered herein is for the balance in each case.

# 570

REPORTS OF THE SUBSIDY BOARD

MSB
CA–101

DELTA STEAMSHIP LINES, INC. AND
WATERMAN STEAMSHIP CORP. )
)
)
In the matter of appeals by Delta Steamship Lines, Inc. )
and Waterman Steamship Corporation of staff disallow- )
ance of construction-differential subsidy payments for )
certain design fees under Contract Nos. MA/MSB–107 ) Decided: April 14, 1981
and 110. ) Served: April 20, 1981

[¶ 2:502[1]]  *Design fees.*
In recommending the reinstatement of design fees, which had previously been disallowed by the Subsidy Board because a staff audit of the records of the design subcontractor hired by the CDS recipients disclosed that the subcontractor had treated its president's time as a direct cost rather than as overhead, the ALJ unduly emphasized the importance of the fact that the fees were the result of arm's length, good faith bargaining between the CDS recipients and the subcontractor for purposes of determining what design costs were "required" for construction of the vessels within the meaning of the CDS agreement and improperly disregarded the post-contract, staff audit for purposes of determining whether the negotiated price was "fair and reasonable" within the meaning of Section 502(a) of the Merchant Marine Act. There was no merit to the recipients' contention that an assessment of costs was irrelevant since a "fair and reasonable" price is whatever price the market will bear, i.e., whatever price a willing buyer is "required" to pay a willing seller. Congress in giving the Secretary of Commerce authority to enter into negotiated contracts required a review of fair and reasonable market prices, especially where, as here, the supplier/subcontractor is virtually the sole source of the needed service. Congress clearly intended a review of costs and not just a market price. Moreover, purchasers were not presented with a choice of

pay or not build since they could have included in their contracts with the subcontractor a provision for recoupment of any costs disallowed through disallowance of subcontractor costs by the Subsidy Board. Delta Steamship Lines, Inc., 20 SRR 1040 [MSB, 1981].

[¶ 2:502[1]]  *Design costs.*
The ALJ erred in recommending the reinstatement of design fees disallowed by the Subsidy Board on the ground that even if the Board had the authority through the inspection of records provision of Section 502(a) of the Merchant Marine Act to determine the subcomponent of "fair and reasonable" design costs for CDS work, the Board relinquished any such authority in approving contracts which represented the meeting of the minds on the subcomponent of fair and reasonable work costs at the time of contract executions. The record did not support the ALJ's conclusion that there was a meeting of the minds on the subcomponent of fair and reasonable design work. The contracts included only total owner expense amounts; the subceiling amounts, however, while components in deriving the total owner expense amounts, did not appear in the contracts. Delta Steamship Lines, Inc., 20 SRR 1040 [MSB, 1981].

[¶ 2:502[1]]  *Design costs.*
While under standard cost accounting principles the treatment of an individual "manager-professional" may be highly discretionary and may require a factual

investigation of the individual's time, the Subsidy Board's staff properly disallowed the treatment of a subcontractor's president's time as a direct cost rather than as overhead where upon an FBI investigation it was discovered that the subcontractor's normal practice was not to charge the time as a direct cost and that the president's time had not been charged to the job until a year and a half after the work had been completed. Delta Steamship Lines, Inc., 20 SRR 1040 [MSB, 1981].

[¶ 2:502[1]] *Design costs.*

While for purposes of determining whether fees for design services charged to CDS recipients were "fair and reasonable" within the meaning of Section 502(a) of the Merchant Marine Act, the fact that the recipients committed for the design fees in good faith, at arm's length bargaining, was entitled to some weight, greater weight should have been accorded to the audited level of direct costs and the normal accounting practices of the design subcontractor, at least under the special circumstances of the present proceedings. Here, after an initial audit of the subcontractor's books, the FBI, acting on information that the subcontractor possessed a separate, more complete ledger than that shown the staff, conducted an investigation which disclosed that the subcontractor had deviated from its customary practice of treating its president's time as overhead with respect to the design agreements at issue and instead charged the time as a direct cost. Moreover, the investigation discovered that the president's time had not been charged to the job until a year and a half after the work had been completed. Accordingly, the staff, after conducting a second audit, properly disallowed a portion of the design costs incurred by the recipients. Delta Steamship Lines, Inc., 20 SRR 1040 [MSB, 1981].

[¶ 2:502[1]] *Design costs.*

The fact that the government had entered into a covenant not to sue the subcontractor who provided design services to CDS recipients, either at common law or under the False Claims Act, 31 U.S.C. §§ 231–232, for improperly treating its president's time as a direct cost rather than as overhead and for deliberately hiding that fact from Subsidy Board auditors was not relevant in proceedings to determine whether fees for the design services were "fair and reasonable" costs within the meaning of Section 502(a) of the Merchant Marine Act, except to the extent that recovering some monies (the subcontractor made a $40,000 payment to the government for the covenant not to sue) necessarily reduced by some unknown quantity the amount of excess subsidy payments. The Board, however, took this into account in the allowance of a fair and reasonable profit to the subcontractor. There was absolutely no merit to the recipients contention that by agreeing not to sue the subcontractor the government was estopped from recovering excess payments from them. Delta Steamship Line, Inc., 20 SRR 1040 [MSB, 1981].

FINAL OPINION AND ORDER OF THE MARITIME SUBSIDY BOARD

Samuel B. Nemirow, Chairman; Bruce A. McAllister, Member; Leonard H. Dickstein, Member

John P. Meade, Esq., and J. Michael Cavanaugh, Esq., Graham & James, Washington, D.C., for Delta Steamship Lines, Inc. and Waterman Steamship Corp.

James F. Ford, Esq., Staff Counsel, Maritime Administration, Washington, D.C.

I.   Introduction

On June 1, 1976, the Maritime Administration staff (Director, Office of Ship Construction) submitted invoices for excess construction-differential subsidy (CDS) payments of $61,485.29 to Delta Steamship Lines, Inc. (Delta) and of $61,043.29 to Waterman Steamship Corporation (Waterman) due to disallowance of CDS reimbursement for certain design fee expenses incurred under Contract Nos. MA/MSB–107 and 110, respectively. Delta

and Waterman appealed this decision to the Board under the disputes provision of the contracts, requested a hearing on their appeals and demanded provisional payment. The Board denied the demand for provisional payment and referred the matter to the Office of Administrative Law Judges (ALJ) for a hearing on the merits of the disputes.[1] On November 2, 1979 [19 SRR 1005], ALJ Frank W. Vanderheyden issued a decision which recommended that the Board order a reinstatement of the disallowed design fees, plus interest from the date such monies became due and owing. Staff Counsel filed exceptions to the recommended decision requesting a de novo review of the record and a reversal of the recommended decision. Delta and Waterman urged that the recommended decision be adopted and requested an expedited decision. No oral argument was requested.

## II. Background

On May 19, 1971, Delta and the Board entered into Contract No. MA/MSB–107, providing for the payment of CDS for the construction of three C9 LASH ships at Avondale Shipyards, Inc. (Avondale). Article 1(d) of the contract states in pertinent part:

"The Board shall pay to the Purchaser [Delta] as construction-differential subsidy 44.2 percent of the Purchaser's cost, not exceeding for subsidy purposes the total sum of $1,411,145, for design work, plan approval and inspections ... required for the construction of the Vessels and furnished by the Purchaser; provided that such costs shall be subject to audit by the Board, and provided further that the cost of Purchaser's design work, plan approval and inspections eligible for

subsidy shall not include salaries or expenses of officers or employees of the Purchaser which would be paid out of the Purchaser's administrative overhead independently of the construction work...."

The sum of $1,411,145 included $450,145 for pre-contract costs, $496,000 for anticipated plan approval expense, and $465,000 for inspection and supervision of construction.[2]

On June 4, 1971, Waterman and the Board entered into Contract No. MA/MSB–110 which also provided for the payment of CDS for the construction of three C9 LASH ships at Avondale. Article 1(d) of Waterman's contract provides:

"The Board shall pay to the Purchaser [Waterman] as construction-differential subsidy 44.2 percent of the Purchaser's cost, not exceeding for subsidy purposes the total sum of $910,000, for design work, plan approval and inspections ( ... excluding costs for design work other than that directly allocable to the Vessels and for which construction-differential subsidy has not heretofore been paid, and also excluding duplicative plan approval and inspection expenses incurred for other LASH construction projects) required for the construction of the Vessels and furnished by the Purchaser; provided that such costs shall be subject to audit by the Board, and provided further that the cost of the Purchaser's design work, plan approval and inspections eligible for subsidy shall not include salaries or expenses of officers or employees of the Purchaser which would be paid out of the Purchaser's administrative overhead independently of the construction work...."

The sum of $910,000 included $210,000 for pre-contract costs, $280,000 for anticipated

---

1. On July 28, 1978, Delta and Waterman petitioned for reconsideration of the Board's denial of provisional payment. These petitions were denied on September 19, 1978. On September 21, 1978, Delta and Waterman supplemented their petition for reconsideration, which supplement apparently crossed in the mails with the Board's denial of the reconsideration request. On October 2, 1978, Staff Counsel filed a response to the supplement and on October 5, 1978 Delta and Waterman responded, including the preface "[W]hile the above matter may no

longer be under active consideration...." Despite the on-going exchange of filings, the petition of Delta and Waterman for reconsideration was denied and concluded on September 19, 1980.

2. Ex. A–1 to Stipulation of Agreed Facts by the Parties, Memorandum to Maritime Subsidy Board from Chief, Office of Ship Construction, May 19, 1971, p. 5.

plan approval expenses, and $420,000 for inspection and supervision of construction.[3]

Although not a matter for consideration in these disputes, the Board also entered into Contract Nos. MA/MSB–113 and 135 on June 29, 1971 and March 22, 1972, respectively, with Central Gulf Steamship Corporation (Central Gulf) for CDS for construction of three similar C9 LASH ships at Avondale. Central Gulf's contracts contained language identical to the Waterman contract but with a total owner expense ceiling of $717,000. Of this amount $205,000 was allocated to design work costs.[4] Subsequently, CDS on fees in excess of $71,893 was disallowed.[5]

All three owners had design services agreements with Friede and Goldman, Inc. (F & G), naval architects and marine engineers. The vessel designs for all three owners are essentially identical and, except for an additional 75 feet in vessel length, the designs also closely agree with that of the initial eleven LASH vessel group for Prudential Lines, Inc. and Pacific Far East Line, Inc. For this design subsidy was paid on a total design expense of $522,519.[6]

The staff did question the magnitude of F & G's design fees before contract award. No agreement with the owner could be reached on a level of design fees in the preaward period. It was indicated in memoranda to the Board that costs of design, approving plans and conducting inspections to be stated in the contract would be "ceilings" only and that only the proper cost for actual design work performed for the owners would be accepted for subsidy payments.[7]

After contract awards, since the staff continued to question the design costs, F & G allowed a MarAd audit to verify that the work performed supported the design fees. The MarAd Central Region audit staff undertook this review, and reported on January 11, 1973, that based on its review, F & G's costs could support design fees of $205,000 for Central Gulf, $211,000 for Delta and $210,000 for Waterman for subsidy purposes under their respective CDS contracts.[8] As a result of the audit, the staff disallowed $239,145 of the Delta design fees since those fees related to work performed on a cancelled containership design. The remaining sum of $211,000 was recognized as an acceptable design cost for Delta.[9] Delta appealed to the Board. In Docket A–80, decided on September 10, 1973,[10] the Board denied Delta's request for the $239,145 CDS payment, concluded "that the design fees subject to CDS assistance under the Contract do not exceed $211,000," and noted that "a central problem is the lack of F & G cost records for the Delta C8 and C9 LASH design projects." The reduction of Delta's design costs, for CDS purposes, from $450,145 to $211,000 is not in dispute in this proceeding. Subsidy payments were therefore made to Delta, Waterman, and Central Gulf on the basis of total design expenses of $211,000, $210,000 and $205,000, respectively.

In October, 1973, after the Board's decision in Docket A–80, the former office manager of F & G reported to the FBI that F & G's books had allegedly been altered for purposes of the MarAd audit. An FBI review of the original cost records indicated to the MarAd staff that overpayments of subsidy had been induced by the information presented to the MarAd auditors by F & G. Whereas the original records treated Mr.

---

3. Ex. A–2 to Stipulation of Agreed Facts by the Parties, Memorandum to Maritime Subsidy Board from Chief, Office of Ship Construction, June 1, 1971, p. 3.

4. Staff Counsel's Prehearing Conference Memorandum, p. 3.

5. SC–24, Affidavit of John J. McGowan, p. 12.

6. Staff Counsel's Prehearing Conference Memorandum, p. 3.

7. Id.

8. Stipulation of Agreed Facts by the Parties, p. 6.

9. Letter to Delta Steamship Lines, Inc. from James S. Dawson, Jr., Secretary, Maritime Administration, February 20, 1973, p. 3.

10. Delta Steamship Lines, Inc., 14 SRR 39 (MSB 1973).

Jerome L. Goldman's (President of F & G) time as overhead, the records shown to MarAd had been allegedly altered to show Mr. Goldman's time as direct costs. A MarAd review of the original cost records concluded that the total design work for the three owners justified a cost not exceeding $215,679, which included a 15 percent profit. The staff allocated this cost evenly among the three owners and determined that CDS would be payable on only $71,893 in design fees per operator. The staff accordingly disallowed for subsidy purposes design fees of $139,107 paid by Delta, $138,107 paid by Waterman, and $133,107 paid by Central Gulf for a total disallowance of $410,321. The CDS participation in the disallowed costs amounted to $201,297.36, which was recovered from the three owners by deducting such sums from subsequent vouchers submitted under the CDS contracts.

On June 5, 1978, the Government, acting through the Department of Justice, Mr. Goldman, and F & G entered into a Covenant Not to Sue. The agreement provided that in consideration of $40,000 "as reimbursement for excess subsidy payments" the United States agreed not to sue under common law or statute Mr. Goldman or F & G for any damages or costs as a result of payments or overpayments of CDS under Contracts MA/MSB–107, 110 and 113. The agreement expressly reserved the right of the Government to proceed against other parties, expressly including Waterman and Delta.

### III. Issues

The Board has undertaken a complete review of the record. Based on that review and the exceptions of Staff Counsel, the following issues are presented for resolution by the Board:

(1) What basis governs determining whether the disputed design fees are eligible for CDS participation.

(2) Whether the disputed design fees, in whole or in part, are eligible for CDS participation.

11. Initial Decision (I.D.), 18–20.

(3) What is the effect of the Government's covenant not to sue on any excess CDS paid for the disputed design fees.

(4) Whether interest is to be paid on any amounts of CDS wrongfully withheld.

#### A. Basis for CDS Participation Determination

The ALJ seems to reason that under Articles 1(d) of the Contracts design work costs within the subceiling implied by the Contracts must be reimbursed with subsidy unless such costs were not "required" for the construction of the vessels and "furnished" by Delta or Waterman.[11] To him the natural and ordinary meaning of "required" is "necessary and related to the construction of the vessels" and is not "fair and reasonable." He found that the term "audit" in Article 1(d) included the meaning "examine and adjust" but not the meaning "fair and reasonable" and in any event the audit provision did not permit a post-contract reexamination of F & G's costs. Essentially, he reasoned that the parties agreed to the fair and reasonableness of the design costs at the time of contract execution and that post-contract examination would only extend to whether the costs related to the construction of the vessels.

The exceptions to his decision and the Board's review of the record raise the following issues for resolution: (1) what is the basis for CDS payment of design work costs, (2) what are the factors to consider in any determination of the fair and reasonableness of the costs, and (3) whether the contract authorizes audit of F & G costs.

#### 1. Basis for CDS Payment

Under Articles 1(d) of Delta's and Waterman's contracts, design work must be "required for the construction of the vessels and furnished by the Purchasers," and such "eligible" costs are "subject to audit by the Board" and exclude certain costs of the Purchasers "which would be paid out of the Purchasers' administrative overhead independently of the construction work." There is no question that Delta and

Waterman incurred the costs in question and therefore can be said to have "furnished" the design work. There is also no question that the costs would not have been included in administrative overhead as salaries or expenses of Delta's and Waterman's employees or officers since the costs represented a payment to an independent entity, F & G. Therefore, the costs are not excludable as otherwise includable in Delta's and Waterman's administrative overhead.

The plain meaning of the remainder of the Article is that there is a post-contract examination of design work costs "eligible" for subsidy, that the costs eligible for subsidy are costs "required" for the construction of the vessels, and that any audit of "such" costs would aid in determining "required" costs that are "eligible" for subsidy.

This reading conforms with the Board's decision in Docket A–80 that in a post-contract examination of design work costs the Board has the authority to disallow any costs not "required for the construction of the vessels," even though the allowed costs may be less than the subceiling amount contemplated in the contracts. In other words, the contract amounts are ceiling amounts and not floor amounts and the unspecified subceiling amounts are not floor amounts. There is essentially no disagreement with these conclusions by the ALJ or Delta or Waterman. (Stipulation of Agreed Facts by the Parties.)

This does not end the analysis of the basis for deciding whether the design fees in question are subsidizable. It is also necessary to consider the statute pursuant to which the contracts were authorized. The contracts cannot exceed the statutory basis under which the contracts were awarded.[12] The contracts were awarded under authority of Section 504 of the Act, which includes the following:

"No construction-differential subsidy, as provided in this section, shall be paid

unless the said contract or contracts or other arrangements contain such provisions as are provided in this title to protect the interests of the United States as the Secretary of Commerce deems necessary."

Certain provisions of Title V of the Act are mandatory so that the Secretary must either include them in the contract or they must be included through incorporation by reference.[13] Specifically, Section 502(a) in authorizing the Secretary to accept negotiated bids in lieu of competitive bids requires as conditions:

(1) the proposed ship purchaser and the shipyard submit backup cost details and evidence that the negotiated price is fair and reasonable;

(2) the Secretary of Commerce finds that the negotiated price is fair and reasonable; and

(3) the shipyard agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment have access to and the right to examine any pertinent books, documents, papers, and records of the shipyard or any of its subcontractors related to the negotiation or performance of any contract or subcontract negotiated under this subsection and will include in its subcontracts a provision to that effect.

Negotiated bidding is an exception to the otherwise required competitive bidding process.[14] For negotiated contracts to be valid the conditions for negotiated bidding must be met. Further, Congress intended to provide the Board with authority to approve negotiated prices only upon the condition that those prices were fair and reasonable.[15]

All contracts involved were negotiated contracts (between the shipyard and Delta and Waterman, between the Board and the shipyard, and between the Board and Delta

---

**12.** *In re Floyd acceptances,* 7 Wall. 666, 676 [19 L.Ed. 169] (1868).

**13.** See *G.L. Christian & Associates v. United States,* 160 Ct.Cl. 58 [320 F.2d 345] (1963).

**14.** 46 USC §§ 1152(b), 1155.

**15.** House Report No. 91–1073, 91st Cong., 1st Sess. (May 12, 1970).

and Waterman).[16] At issue herein is payment of CDS. The only CDS authorized under the Act is to the shipyard as a differential of the domestic and foreign cost of constructing the vessel.[17] If owner's expenses for design work can be reimbursed by CDS, it can only be on the basis that but for the owner's expenses the shipyard price would be higher by that amount. (For ease of administration and because not all the owner's expenses are known at the time of contracting (e.g., inspection costs) the owner expenses are not added to the shipyard price to calculate CDS but rather are excluded and paid on the same differential as on the shipyard contract).

Since the only basis for payment of CDS is the differential on the shipyard price and since owner's expenses are by analogy a part of the shipyard price, it follows that the conditions imposed for the negotiated shipyard price must be applied to any subsidy to be paid for owner's expenses. Otherwise there is no statutory basis for CDS payment for any owner expenses. In connection with the award of the contracts to Delta and Waterman, the Board, after review of backup data, did find, at least by implication, that an amount not in excess of that set forth in the contracts is fair and reasonable.

The ALJ seemed to conclude that even if the Board had authority to determine the subcomponent of fair and reasonable design work costs, the Board relinquished any such authority under the circumstances. He reasoned that the Board already made the determination of fair and reasonableness in the meeting of the minds on the contract amounts at the time of executing the contracts.

Articles 1(d) of the contracts include only total owner expense amounts. The subceiling amounts, however, while components in deriving the total owner expense amounts, did not appear in the contracts. Therefore, they were not necessarily either upper or lower limitations to the final determinations so long as the sum of the components does not exceed the agreed total ceiling amounts ($1,411,145 for Delta and $910,000 for Waterman). The parties' agreed facts recognize that on occasion some final owner expense components have been greater in some instances and lesser in other instances than the subceiling amounts. (paras. 26, 28). The ALJ's conclusion that there was a meeting of the minds on the subcomponent of fair and reasonable design work costs at the time of contract executions is not supported by the record.

The ALJ also relied on Docket A–80. The decision in that docket, as already noted, did not reach the issue presented herein but only addressed whether certain (and not other) fees were required for construction of the vessels.[18] The ALJ further relied on a Board letter to Delta of February 20, 1973, in which it was stated in passing that "[t]he Board has no question that CDS payments for $211,000 for a prior LASH C8–S–81b design can be approved." The purpose of that letter was to provide Delta the opportunity to address CDS payments of $239,145 design fees and not the remaining $211,000 for design fees. It was not a letter purporting to be a decision on any subject. Further, the letter preceded the FBI investigation. Therefore, the Board finds no relinquishment of its authority to determine the fair and reasonable design work costs eligible for CDS.

Accordingly, in determining the design work costs eligible for CDS payment the Board in this context must determine, among other things, the costs "required" for construction of vessels, must take into account the requirement for such costs to be subject to Board audit review and must take into account the statutory parameters applicable to the contract provision, including the finding that the negotiated price is fair and reasonable.

---

16. E.g., P–1, Contract No. MA/MSB–107, p. 2; p–2, Contract No. MA/MSB–110, p. 2.

17. Section 502(b) of the Act, 46 U.S.C. § 1152(b).

18. 14 SRR 39, 42.

## 2. Factors in Deciding Fair and Reasonableness

It is also necessary to consider the factors that are contemplated under statutory and contractual requirements in determining fair and reasonableness. The parties suggest the following: (i) related and necessary for vessel construction, (ii) arm's length transaction, (iii) sound business judgment in incurring the costs, (iv) free of wrongdoing by Delta and Waterman, (v) cost in relation to charge by other naval architects, (vi) previous approvals by the Board and/or its staff, (vii) good faith of Delta and Waterman, (viii) Delta's and Waterman's obligation to pay the balance, (ix) staff's expert opinion, and (x) consistent accounting and billing practice of F & G. The last factor raises the issue whether the Board may audit F & G's costs, i.e., whether the Board may look beyond payments by Delta and Waterman. As discussed in the next section, the Board finds that it may consider the results of such an audit. For that reason it is concluded that all the factors cited, except Delta's and Waterman's obligation to pay the balance,[19] are to some greater or lesser extent, relevant in deciding whether design work costs are fair and reasonable for CDS purposes.

## 3. Audit of F & G Costs

The ALJ concluded that the contracts only expressly authorized Board audit of "such" costs, namely costs of Delta and Waterman and not their subcontractor costs. The ALJ also noted that subsequent contracts included express provisions for audit of subcontractor's costs.

Under Section 502(a) of the Act, Delta and Waterman, standing in the shoes of the shipyard, had to agree to make subcontractor records available for inspection and were required to include such provision in their subcontracts. Delta and Waterman did not include such provision in their "con-

tracts" nor did the Board or its staff suggest such a provision. Given the lack of privity between the Board and F & G this might have posed a most difficult problem since any meaningful "audit" of the design work costs would have been nigh impossible without F & G's records. However, F & G consented to the audit of its records without protest from Delta and Waterman. We therefore need not decide whether the Board had such authority in that situation. Since Delta and Waterman must consent to the availability of subcontractor records for there to be a valid basis to pay CDS for any owner expenses and since Delta and Waterman did not contemporaneously protest such audits, they have no basis to exclude evidence of the audits. The results of those audits will be considered herein.

## B. CDS Participation in Disputed Design Fees

The parties disagree over whether the disputed design fees are required for construction of the vessels, whether the audit review results in approval or disapproval of CDS for the design costs, and whether the disputed fees are fair and reasonable.

## 1. Required for Construction

The ALJ apparently found that the design fees were "required" for construction of the vessels because Delta and Waterman had to pay the fees to effect construction of the vessels. By "required" the ALJ intended "necessary and related to the construction of the vessels" and not "fair and reasonable." (I.D. 19.) Staff Counsel maintains that "required" does not include costs "related" to ship construction but only those costs "necessary to the construction." Staff Counsel means by "required" those costs resulting in design of the vessels as determined by audit of F & G books. It apparently subsumes a standard of "fair and

---

**19.** The liability and extent of liability between Delta and Waterman, on the one hand, and F & G, on the other hand, whether under the Design Service Agreements or otherwise, for any balance due under the circumstances is not an issue for the Board to decide in this proceeding.

F & G was not a party in the proceeding; neither the law nor the facts of this issue are adequately briefed; and the issue is not relevant to whether the costs are fair and reasonable.

reasonable" under the "required determination." Inasmuch as one of the bases for determining eligibility of the disputed design fees is "fair and reasonable" it is unnecessary to resolve this controversy over the substantive content of the phrase "required for construction of the vessels."

2. Subject of Audit

The ALJ found that the term "audit" meant "examine and adjust," including determining whether the costs were related to the construction. He found that the phrase "subject to audit" did not "necessarily" mean that auditors could consider the fairness and reasonableness of the costs if that had already been determined at the time of the contract. (I.D. 21.) Staff Counsel disagrees that the term audit includes "related" to construction.

It maintains that the phrase "subject to audit" does permit a determination of the fairness and reasonableness of the costs. Again, since it is decided herein that one of the bases for determining eligibility of the disputed design costs is "fair and reasonable" it is unnecessary to resolve this controversy.

3. Fair and Reasonable

There is substantial agreement, or at least absence of disagreement, over many of the factors to be considered in deciding whether the design work costs are fair and reasonable. There is no question that Delta and Waterman at all times acted in good faith, that they negotiated at arms length with F & G over the design costs, and that they paid the fees to F & G. The ALJ found that there is no evidence that other shipowners in exercise of their sound business judgment would have negotiated different amounts or that any other naval architect would have charged any less than that charged by F & G. These are findings of lack of evidence and not conclusions follow-

ing analysis of design charges. F & G's prior involvement in design of LASH vessels at a significantly lesser charge and dominance in this market indicates there was little competition in this area and that the parties were not exactly of equal strength in negotiating the fees. It was a seller's market. Beyond these considerations, the parties are not in agreement.

Staff Counsel sets forth as its criteria of fair and reasonable its judgment of the costs after audit of F & G's books. That audit shows a total design cost per purchaser of $62,516.[20] It shows that Mr. Goldman previously and subsequently did not charge his time as direct time to projects but did so as to this project a year and a half after the fact. Applying a 15% profit, which the staff claims F & G had proposed, the staff derives its estimate of $71,893 for each Purchaser. To state it differently if the Purchasers' position were to prevail, Staff Counsel maintains F & G would realize profits of over 230% on these design fees.

Purchasers respond that an estimate based on cost is not relevant, that fair and reasonable is the price a willing seller can secure from a willing buyer. They claim Staff Counsel does not understand that they must have either paid or not built the ships.

The evidence establishes that the design fees advocated by the Purchasers are those that a willing seller (F & G) could and did secure from a willing buyer (Waterman, Delta and Central Gulf) at arms length bargaining. That does not end the matter. Congress in giving the Secretary of Commerce authority to enter into negotiated contracts required a review of fair and reasonable market prices, especially for suppliers such as F & G who were virtually sole source[s]. However else the term "fair and reasonable" may be defined in other contexts, in this context Congress intended a review of costs and not just market price.[21]

---

**20.** SC–25, p. 3.

**21.** The legislative history of the 1970 Act manifests the concern of Congress that the traditional protection of the competitive bidding process, in assuring the Government the lowest

reasonable prices, would be jeopardized if a negotiated bidding process were adopted. Congress was well aware of severe cost overruns incurred under the non-competitive bidding process. Hearings on H.R. 15424, H.R. 15425, and H.R. 15640 Before the House Sub-

Purchasers were not presented with a choice of pay or [not] build. They could have included in their contracts with F & G a provision for recoupment of any costs disallowed through disallowance of F & G costs. Their dilemma was no different from that faced by general contractors securing government subsides and yet having subcontractors.

Purchasers question two specific aspects of the staff's estimate. They contest disallowance of Mr. Goldman's time as a direct charge to the project and the 15% profit permitted by the staff.

The record shows that F & G's normal practice was to collect design costs against a job code number and that direct labor was recorded on the employee's time sheets and posted to the payroll journal and all other design costs were recorded in the job cost ledger directly from the check book (CC–22, para. 5). F & G originally represented they had no job cost records for the Delta LASH design work, that Waterman and Central Gulf were collected on job code 9362 until July 1, 1972, and thereafter on job codes 9370 and 9379, that the indirect expense recorded in the job cost ledger was determined each month by dividing the total indirect expenses by total labor hours for all jobs to arrive at an overhead rate per hour and that this rate was then multiplied by the number of direct labor hours for a specific job to determine the indirect expense for the job. (SC–22 para. 6.) Upon an FBI investigation it was discovered that a separate job cost record was kept for the Delta project, that Mr. Goldman's time had been charged to job code number 9362 a year and a half after the work had been completed, that the normal procedure within F & G was that Mr. Goldman's time was included in overhead, and that job code 9362 was in fact de minimis as to these projects. (SC–23, para. 7.)

The Purchasers argue that under standard cost accounting principles the treatment of an individual "manager-professional" is highly discretionary, that a factual investigation of the individual's time is necessary, that rigid consistency is not compelled from job to job, and that Staff Counsel failed to review the nature of Mr. Goldman's efforts or to establish on the record any inconsistency with the prior LASH projects. Purchasers' points would be matters to consider if F & G's records were kept in the normal course of business and entitled to some presumption of regularity. No such presumption is warranted on this record of false representation and double bookkeeping. So far as the record shows it is not F & G's normal business practice to charge Mr. Goldman's time directly to these types of projects.

On the other hand, Staff Counsel's contentions for a 15% profit are not convincing. Upon the initial staff audit it was believed that the costs were $304,801.64 for the Waterman and Central Gulf portion of the LASH projects compared to total design fees of $415,000. This is an apparent profit of $110,198.39 or in excess of 36.15 percent to which the staff had no objection. The record also shows that the staff had no objection to an originally believed profit level of 22 and 24 percent above perceived costs. These staff findings are not consistent with a strict 15 percent profit.

While these levels of profit (22 to 36.15 percent) are far in excess of that normally

comm. on Merchant Marine of the Comm. on Merchant Marine, 91st Cong. 2d Sess., 296–97, 388–89 (1970), and therefore *insisted on a number of protections, including the right of the Secretary to review the reasonableness of the price components of the bid and determine that the price is fair and reasonable.* S.Rep. No. 91–1080, 91st Cong., 2d Sess. 27 (1970), U.S. Code Cong. & Admin.News 1970, p. 4188; H.Rep. No. 91–1073, 91st Cong., 2d Sess. 32 (1970); Cong.Rec. H. 4679 col. 1, May 21, 1970; Hearings on S 3287 Before the Senate Merchant Subcomm. of the Comm. on Commerce,

91st Cong., 2d Sess. 123 (1970). Further, it was the congressional understanding that the *negotiated bidding process would be employed,* among other uses, *to reduce bids below those secured through the competitive bidding process in order to achieve the productivity goals.* H.Rep. No. 91–1073, 91st Cong., 2d Sess. 32 (1970); S.Rep. No. 91–1080, 91st Cong., 2d Sess. 27 (1970). In other words, Congress did not expect or compel the Secretary to accept as *fair and reasonable prices negotiated at arms length and in good faith.*

considered reasonable in Government contracting, the Board appreciates that at issue are professional services, that the staff has at least implicitly recognized these higher levels as reasonable, and that it is arguable under the Covenant Not to Sue, as next discussed, that the Government has already received some unquantifiable compensation for excess subsidy payments. Under these circumstances, the Board approves as fair and reasonable the staff implicitly recognized profit level of 36.15 percent.

From the foregoing, the Board concludes that while some weight is appropriate to the fact of Purchaser's having committed for the design fees in good faith at arms length bargaining, greater weight must be accorded to the level of direct cost and proper accounting practices, at least under the special circumstances prevailing in these proceedings. It is therefore found that the record supports that the best estimate of the fair and reasonable costs required for construction of the vessels and, furnished by all three Purchasers is $255,-345.[22] Accordingly, Delta and Waterman would each be owed CDS on $13,222.[23]

C. Covenant Not to Sue

The Covenant Not to Sue, dated June 5, 1978, is as follows:

"Covenant Not to Sue

"For and in consideration of the payment by Jerome L. Goldman and Friede & Goldman, Inc., of the sum of Forty Thousand Dollars ($40,000) as reimbursement of excess subsidy payments, receipt of which is hereby acknowledged, the UNITED STATES OF AMERICA does, by these presents, promise, agree, and covenant not to sue or claim in litigation against Jerome L. Goldman, Friede & Goldman, Inc., or its officers and employees, any and all civil claims and causes of action, whether at common law, under the False Claims Act, 31 U.S.C. §§ 231–232, or other statute, and any other dam-

ages or costs caused by or arising from the conduct, performance, and receipt by Jerome L. Goldman and Friede & Goldman, Inc., its officers and employees, of payments or overpayments of U.S. Maritime Administration Construction Differential Subsidy funds pursuant to contracts MSB–107, MSB–110, and MSB–113, and the submission of claims, vouchers, or substantiating documents in support of said payments.

"Further, it is understood that the aforesaid payment shall not constitute an admission on the part of Jerome L. Goldman and/or Friede & Goldman, Inc. of any violation of the False Claims Act or other applicable statute or law, and is occasioned by the parties' mutual desire to avoid the costs and uncertainties of litigation.

"Provided, however, that this Covenant Not to Sue is only for the benefit of Jerome L. Goldman, Friede & Goldman, Inc., and its officers and employees, and no other person or entity shall gain any right or assert any defenses by means of this instrument and undertaking, and the United States of America hereby specifically excepts and reserves unto itself any causes, claims or rights of action that it has or may have against persons or entities other than those enumerated heretofore, arising out of the conduct and transactions above-described, and this reservation of rights specifically includes possible or pending administrative actions or other legal proceedings between the United States of America and Waterman Steamship Corporation, Central Gulf Lines, Inc., and Delta Steamship Lines, Inc.

"IN WITNESS WHEREOF, the UNITED STATES OF AMERICA, through its duly authorized representative, has executed this instrument on this 5th day of June, 1978.

"UNITED STATES OF AMERICA

---

**22.** Total actual costs of $187,547 (SC–25, p. 3) at 36.15 percent profit is $255,345 rounded to the nearest dollar.

**23.** The difference between the staff allowed design costs of $215,679 and that recognized herein of $255,345 is $39,666. Distributed equally among the three Purchasers, $13,222 would be allocable to each.

"By: (signed) J. Roger Edgar
Chief, Frauds Section
Civil Division
U.S. Department of Justice
Washington, D.C."

The ALJ found that the Covenant Not to Sue involved the same monies as were involved in the withheld CDS funds. He held that the staff was attempting inequitably to make the Purchasers vicariously liable for F & G's alleged acts and at the same time releasing F & G, and the staff "should not turn" to the Purchasers for any compensation that should flow from F & G. The ALJ relied heavily on perceived equitable considerations (I.D. 18, 24, 25).

Staff Counsel argues that the Covenant Not to Sue is not relevant to this proceeding. He views the covenant as a promise not to sue in exchange for $40,000 based on many factors outside the scope of this dispute. He claims the Purchasers were paid for the costs required for ship construction and there can be no unjust enrichment when°a party has received its consideration under a contract.

The Purchasers reply that the disallowances were unconscionable and resulted in unjust enrichment to the Government at their expense. In their view the doctrine of unjust enrichment permits them to recover money held by one party (the Government) where equity and good conscience require transfer to another (themselves). The "equity" in their view is that the sums involved in these disputes are the same as involved in the Covenant, that they were mere "conduits" to F & G of the alleged excess subsidy payments, and that the Government has received full satisfaction of its claim from F & G (by compromise). Therefore, they believe the Government is effecting "double recovery" from the innocent while permitting the alleged wrongdoer to escape virtually all payments.

Assuming, without deciding that the issue of whether estoppel under the Covenant Not to Sue is an issue that "arises" under

the contract and therefore under this proceeding, the Board cannot agree with the Purchasers' view of the Covenant Not to Sue. The Covenant begins "For and in consideration of the payment by Jerome L. Goldman and Friede & Goldman, Inc., of the sum of ... $40,000 ... as reimbursement of excess subsidy payments...." The Covenant expressly, however, addresses "any and all civil claims and causes of action, whether at common law, under the False Claims Act, 31 U.S.C. §§ 231–232, or other statute, and any other damages or costs" and restated in another paragraph "any violation of the False Claims Act or other applicable statute or law." In other words, no administrative contract dispute proceeding is mentioned. In contrast, in reserving rights against the Purchasers the covenant addresses "possible or pending administrative actions or other legal proceedings." The point is that the covenant was carefully drafted to address non-contract actions against Mr. Jerome L. Goldman and F & G and all legal rights including contract actions against Purchasers. Therefore, the amounts covered by the covenant differ from the amounts at issue in this proceeding, although the covenant phrases them as "excess subsidy payments" since such payments were the basis from which the non-contract actions arose.

Notwithstanding this careful drafting and the different nature of claims involved in the covenant and this proceeding, the $40,000 payment under the Covenant Not to Sue was characterized as "reimbursement of excess subsidy payments." What precise calculations were involved in arriving at the $40,000 payment is unknown and by the nature of the agreement unknowable. The intent of the parties, however, apparently was that whichever legal recourse the Government refrained from pursuing, it had as its ultimate basis the excess subsidy payments involved.[24] Recovering some monies on that basis necessarily reduced by some unknown quantity the amount of ex-

---

24. For instance, the False Claims Act provides for recovery of $2,000 for each false claim and double the amount of damages the Government may have sustained. 31 U.S.C. § 231. The "damages" would include the overpayments of CDS funds.

cess subsidy payments. The Board has taken into account this matter, on the assumption that this matter is appropriate to consider in this proceeding, in the allowance of a fair and reasonable profit, as already discussed.

The Board does not agree that Purchasers are mere "conduits" of excess subsidy payments for purposes of liability for such payments and responsibility for proper contract disbursement. The Purchasers were the contractual parties with the Government, assenting only to that subsidy required for construction of the vessels and fair and reasonable. Given this contractual relationship, it is not a fact, as implied by the Purchasers, that the Government would not have a claim against them separate from any claim against F & G.

Moreover, Purchasers in attempting to avoid the loss of any CDS funds previously paid them, give no recognition to the legal effect of a covenant not to sue and the express reservation of rights against them in the Covenant. The legal effect of a covenant not to sue, with a reservation of right, even assuming the situation herein were analogous to a covenant agreeing not to sue one of two or more joint debtors, is that the debt is not completely discharged and the other joint debtors remain bound.[25] As already discussed, the Covenant Not to Sue in terms of its agreement with F & G and Mr. Goldman does not address the contractual relationships with Purchasers, but rather statutory and common law liability of F & G and Mr. Goldman and therefore, as Staff Counsel urges, the Covenant is not germane to this proceeding, except to the extent already discussed.

### D. Interest

The ALJ recommended awarding interest on the CDS amounts withheld without citing any authority for the payment of interest. The contract does not provide for payment of interest on CDS amounts wrongfully withheld; neither does any relevant regulation or statute. Purchasers have not brought any such authority to our attention and in fact there is a statutory prohibition against recovering interest against the Government in similar situations.[26] Purchasers' reliance on the broad policy of Title V of the Merchant Marine Act, 1936, as amended, is unpersuasive.

### IV. Conclusion

For the reasons set forth herein, we conclude that (1) design fees of $210,000 and $211,000 for Waterman and Delta, respectively, are not entirely required for the construction of vessels, fair and reasonable, or eligible for CDS participation; (2) design fees of $85,115 are acceptable for Waterman and Delta, each; (3) to the extent CDS has not already been paid on those amounts, CDS shall be paid to Waterman and Delta and (4) no interest shall be paid on such sums. Accordingly, Waterman and Delta are each entitled to be paid $5,844.12 in resolution of this dispute.

---

**25.** Williston on Contracts, 3rd ed. (1972) Section 338. The same result follows if this matter were analogous to a tort claim. Id. Section 338A.

**26.** "Interest is not recoverable against the United States under 28 USC § 2516(a)." *Sun Ship-*

building & Dry Dock Co. v. U.S. Lines, Inc., 12 SRR 551, 598 (MSB 1971); See *Sun Shipbuilding and Dry Dock v. Prudential—Grace Lines,* 17 SRR 335, 385 (MSB 1977); *Sun Shipbuilding & Dry Dock Co. v. United States Lines, Inc.,* 439 F.Supp. 671 [15 SRR 271] (ED Pa.1977).